### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **JOHN PAUL CASTILLO III**, | |
| Plaintiff**,** | |
| v. | Case No. _____ |
| **UNITED AIRLINES, INC.**, | JURY TRIAL DEMANDED |
| Defendant. | |

### COMPLAINT

This action involves claims for disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; retaliation under the ADA and Title VII; and defamation under Texas common law.  Plaintiff John P. Castillo ("Castillo" or "Plaintiff"), by and through his attorneys, alleges as follows:

### INTRODUCTION

1.　　United Airlines, Inc. ("United") terminated First Officer John P. Castillo—a decorated C-130 combat pilot—under the pretense of "pilot performance" issues.  In truth, United fired him because it regarded him as disabled due to a perceived alcohol-use disorder, because he is Hispanic, and because he exercised his rights by retaining counsel.

2.　　Mr. Castillo joined United in January 2023 after thirteen years as an Air Force pilot and quickly earned his place as a skilled and dependable First Officer,

1

flying revenue passengers by March 2023. On July 22, 2023, he was arrested in Montgomery County, Texas, for suspected DUI based solely on a field-sobriety test; no blood-alcohol concentration was ever confirmed, and all charges were later dismissed. Until that incident, his only offenses were a 2004 minor traffic violation and a 2011 speeding ticket. Consistent with United policy and FAA regulations, he immediately reported the arrest to both United and the FAA and retained counsel to handle the DUI matter.

3.    Within days of the arrest, United began pressuring Mr. Castillo to enter the Human Intervention Motivation Study ("HIMS") Program—a substance-abuse treatment track for pilots with diagnosed alcoholism. United's insistence reflected its perception that he was an alcoholic. Mr. Castillo declined pending an independent psychiatric and substance-abuse evaluation scheduled for November 2023. That evaluation, conducted by Dr. George S. Glass, M.D., concluded that the incident was "a one-off, aberrant event," that Mr. Castillo had no alcohol-use disorder, and that he was not a HIMS candidate.

4.    Despite these findings—and before the evaluation was even completed—United terminated him on November 6, 2023. The company used a temporary lapse of his FAA first-class medical certificate as a pretext, though pilots in comparable circumstances are routinely placed on unpaid leave until re-certified. United's decision to fire Mr. Castillo while allowing other pilots—including those actually diagnosed with alcohol use disorder—to remain employed during FAA

review demonstrates disparate treatment based on its mistaken perception that Mr. Castillo was an alcoholic.

5.     Throughout this period, Mr. Castillo kept United fully informed of his medical-certificate status—both through his own communications with Assistant Chief Pilot ("ACPO") Michael Bettencourt and through updates relayed by his Air Line Pilots Association ("ALPA") representative on his behalf.  In these exchanges, Mr. Castillo and his representative specifically notified Bettencourt that Mr. Castillo's first-class medical certificate was set to lapse pending FAA review and requested information about possible options.  Bettencourt acknowledged that pilots awaiting medical clearance were routinely placed on unpaid leave until their certificates were renewed.  Despite having the same information, United departed from its established practice and on November 6, 2023, Chief Pilot Ernie Aller left Mr. Castillo a voicemail abruptly terminating his employment.

6.     On information and belief, another White probationary pilot at the same base, arrested for DUI shortly after Mr. Castillo, retained his position despite lacking a valid medical certificate because he enrolled in HIMS.  United officials cited that pilot's case when urging Mr. Castillo's ALPA representative to "make sure every pilot knew about HIMS and the protection it could offer."  United's disparate treatment of similarly situated White pilots—including those with confirmed alcohol-related conditions who were given continued employment or leave—underscores the pretextual and discriminatory nature of Mr. Castillo's termination.

7.     United's perception of Mr. Castillo as an alcoholic was not a neutral medical judgment but reflected racialized stereotypes about Hispanic men and alcohol use.  These intertwined biases—viewing a Hispanic pilot's single arrest as evidence of addiction while extending leniency to White pilots for comparable conduct—amplified the discriminatory motive underlying United's decision.  United's reliance on that stereotype explains both its misperception of Mr. Castillo as impaired and its harsher treatment of him compared to similarly situated White pilots.

8.     United compounded the harm by falsely reporting to the FAA that Mr. Castillo's termination was for "pilot performance" issues—a stigmatizing designation later corrected only after he retained specialized counsel.  Mr. Castillo pursued both internal union remedies and a timely EEOC complaint, receiving a right-to-sue letter on July 15, 2025.

9.     United's own statements confirm its retaliatory motive: on November 6, 2023, Chief Pilot Aller admitted to Mr. Castillo's ALPA representative that he was fired for "lawyering up and not communicating."  Aller's statement demonstrates that United's decision was motivated not only by its misperception of alcoholism but also by retaliation for Mr. Castillo's protected act of retaining counsel to defend his rights.

**PARTIES**

10.     Plaintiff John P. Castillo is an individual who resides at 7727 Creek Glen, Houston, TX 77095, where he lived at the time of his termination as a First Officer for Defendant on November 6, 2023.

11.    United Airlines, Inc. is a Delaware corporation headquartered in Chicago, Illinois, doing business in Texas, including at Houston's George Bush Intercontinental Airport (IAH), where Castillo was based.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).

13.    This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367, as that claim arises from the same nucleus of operative facts as Plaintiff's federal claims

14.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

15.    Venue is proper in this district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district, including Plaintiff's employment and termination at Houston's George Bush Intercontinental Airport (IAH); Plaintiff resides in this district; and Defendant does business in this district.

16.    Plaintiff has exhausted his administrative remedies under the ADA and Title VII. Plaintiff, acting pro se, initiated contact with the EEOC on November 18, 2023. Due to the EEOC investigator's advice to wait for resolutions from the FAA and union grievance process, the formal charge (EEOC Charge No. 440-2024-01609) was signed and filed on September 13, 2024. The EEOC issued a right-to-sue letter on July 15, 2025. This action is filed within 90 days of receipt of that letter.

5

## FACTUAL ALLEGATIONS

### A.    *Mr. Castillo's Background and Exemplary Military Service*

17.    Mr. Castillo is a Hispanic male born in 1986 in Houston, Texas.  He attended Embry-Riddle Aeronautical University in Daytona Beach, Florida, on a four-year ROTC scholarship from the U.S. Air Force, pursuing his goal of becoming a pilot.  He was commissioned as a Second Lieutenant in 2009 and completed a 56-week pilot training program.

18.    Mr. Castillo's thirteen years of distinguished active-duty service in the U.S. Air Force included three combat deployments, hundreds of combat missions, and thousands of combat flight hours.  His performance earned multiple commendations for leadership and operational excellence.

19.    In January 2023, Mr. Castillo transitioned to the Texas Air National Guard, where he remains on active-duty orders.  He completed Air Command and Staff College and was recently selected for promotion to Lieutenant Colonel, reflecting his continued excellence and qualification as a pilot.

20.    Before the events giving rise to this lawsuit, Mr. Castillo's entire record with law enforcement consisted of two minor traffic citations—one from 2004, and one in 2011.

21.    Defendant United Airlines, Inc. ("United") is a common carrier engaged in interstate and international air transportation and is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990, employing more than fifteen employees and engaging in commerce within the United States.

**B.    *Mr. Castillo's Employment Relationship with United Airlines Begins***

22.    Mr. Castillo was hired by United in January 2023 as a First Officer after successfully completing the company's hiring and training process.

23.    He began flying revenue passengers in March 2023 and performed all duties satisfactorily, with no disciplinary issues or performance concerns noted before the events leading to his termination.

24.    On July 22, 2023, Mr. Castillo was arrested in Montgomery County, Texas, for suspected driving under the influence ("DUI").  The arrest was based solely on a roadside field-sobriety test; no blood or breath test was administered to indicate any blood-alcohol concentration.  The charge did not result in a conviction, and all criminal proceedings were resolved without adjudication of guilt in 2024.

25.    In compliance with United policy and FAA regulations, Mr. Castillo promptly notified his Chief Pilot, Ernie Aller (a White male), of the incident.

26.    Mr. Castillo retained counsel, Doug Murphy, to represent him in connection with the DUI matter.   On August 22, 2023, Mr. Castillo provided a letter from Mr. Murphy to United addressing the incident and advising United that: (1) the court had imposed no bond or license restrictions and (2) Mr. Castillo's driving privileges remained fully intact.

27.    United initially placed Mr. Castillo on paid leave and later on unpaid leave pending review.  During this period, Mr. Castillo worked closely with his Air Line Pilots Association ("ALPA") representative, who assisted in preparing him for an August 2, 2023, investigation meeting with management, including ACPO Bettencourt.

### C.    *United Pressures Mr. Castillo to Enter the HIMS Program and Then Terminates Him*

28.    At the August 2 meeting, United urged Mr. Castillo to enroll in the Human Intervention Motivation Study ("HIMS") Program—a substance-abuse monitoring and rehabilitation program jointly administered by the FAA and participating airlines for pilots diagnosed with alcohol or chemical dependency. Enrollment in HIMS typically follows a substance-use diagnosis and involves medical treatment, peer monitoring, and FAA re-certification.

29.    Mr. Castillo declined to enroll at that time, consistent with medical advice from his AME Dr. Greg Pinnell, who recommended awaiting an independent psychiatric and substance-abuse evaluation before deciding whether Mr. Castillo qualified for HIMS.  That evaluation, conducted by Dr. George S. Glass, M.D., concluded that the July 2023 incident was "a one-off, aberrant event," that Mr. Castillo had no alcohol-use disorder, and that he was not a candidate for HIMS participation.  Nevertheless, before Dr. Glass's evaluation was complete, ACPO Bettencourt continued to pressure Mr. Castillo to enter HIMS, reinforcing United's mistaken perception that he suffered from alcoholism.

30.    In the following months, Mr. Castillo continued cooperating fully with United.  His AME scheduled his regular FAA First-Class Medical examination for October 16, 2023.  At that appointment, Dr. Pinnell deferred the renewal of Mr. Castillo's medical certificate pending FAA review—a routine process known to United management.

8

31.     Mr. Castillo and his union representative remained in close contact with ACPO Bettencourt regarding this process.  On October 17, Mr. Castillo left his ALPA representative a voicemail explaining that his medical renewal had been deferred. At an October 19 in-person meeting, his ALPA representative informed Bettencourt that Mr. Castillo's medical qualification would lapse at the end of October; Bettencourt responded that this was "not a problem" so long as Mr. Castillo was working toward recertification, which he was.

32.     On October 31, 2023, Bettencourt acknowledged by email that Mr. Castillo did not currently hold a valid First-Class Medical Certificate.  Mr. Castillo followed up with Bettencourt on November 1, detailing the steps he had taken and the options available while the FAA review was pending.  Bettencourt confirmed this call by email the same day.

33.     Despite these repeated communications, United terminated Mr. Castillo five days later, on November 6, 2023, ultimately citing "inability to perform duties" to the FAA as the reason for termination.  The termination was contrary to the assurances previously given by Bettencourt and to United's routine practice of allowing other pilots with temporary medical deferrals—including those participating in HIMS for confirmed alcohol-use disorders—to remain on unpaid leave pending recertification.

34.     These facts demonstrate that United had full knowledge of Mr. Castillo's status and intent to maintain his FAA qualifications but chose instead to treat him as an alcoholic and terminate him on that perceived basis rather than follow its

standard practices for other pilots.  United's insistence that Mr. Castillo enter HIMS, coupled with its refusal to extend him the same treatment afforded to pilots with actual or unrelated medical lapses, shows that the company regarded him as impaired and acted on that perception.

### D. United's Discriminatory and Retaliatory Termination

35.    By early November 2023, United had full and repeated notice of Mr. Castillo's medical-certificate status and of the steps he was taking to obtain recertification.  Between mid-October and November 1, he provided multiple verbal updates and written confirmations to ACPO Bettencourt regarding his deferred FAA medical, each of which Bettencourt acknowledged in real time.  United therefore knew that Mr. Castillo was actively engaged in the FAA review process and cooperating fully.

36.    Despite that knowledge—and contrary to Bettencourt's prior assurances that a temporary lapse was "not a problem" so long as recertification was underway— United abruptly terminated Mr. Castillo's employment on November 6, 2023.  Chief Pilot Ernie Aller left a voicemail notifying him of the termination and citing "inability to perform duties."  The decision was made without further inquiry, meeting, or notice, even though United routinely allows pilots in similar circumstances to remain on unpaid leave pending renewal of their medical certificates.

37.    United later claimed that Mr. Castillo was fired for "failure to communicate." That assertion is false.  Mr. Castillo's documented phone calls, emails, and written updates—including those of October 17, 19, 31, and November 1— demonstrate continuous communication with management regarding his FAA status.

Each communication was acknowledged by Bettencourt, confirming that United had accurate and current information at every stage. The "failure-to-communicate" rationale was a post-hoc pretext designed to conceal discrimination and retaliation.

38.     At the time of Mr. Castillo's termination, another White probationary pilot arrested for DUI around the same period was permitted to remain employed despite lacking a valid First-Class Medical Certificate, because United treated that pilot's circumstances as remediable through participation in the HIMS Program. United, however, refused to afford Mr. Castillo the same opportunity to maintain employment while addressing his medical-certificate status, instead treating him as permanently disqualified based on its mistaken belief that he suffered from alcoholism. United's perception that Mr. Castillo was an alcoholic—an imagined impairment—constitutes discrimination "on the basis of disability" under the ADA; its refusal to extend to him the leniency granted to White pilots with actual alcohol diagnoses reflects discrimination on the basis of race and national origin under Title VII.

39.     United's handling of Mr. Castillo's situation also departed from its ordinary practices. According to individuals familiar with standard procedures, pilots whose medical certificates lapse are typically placed on unpaid or medical leave while they work with the FAA toward renewal. United's refusal to extend that routine practice to Mr. Castillo—while simultaneously asserting that he "failed to communicate"—further underscores that its stated reasons were pretextual and motivated by discriminatory assumptions rather than neutral policy enforcement.

40.    On information and belief, the decision to terminate Mr. Castillo was influenced by stereotypes linking Hispanic men with alcohol abuse and by hostility toward his decision to retain legal counsel to protect his rights.  When Mr. Castillo's ALPA representative later learned of the termination, she expressed surprise, noting that such an outcome was highly irregular under United's own past practices.

41.    United's actions culminated in a false and defamatory report to the Federal Aviation Administration stating that Mr. Castillo was terminated for "pilot-performance" issues.  That entry damaged his professional reputation and future employment prospects until it was later corrected through legal intervention.

42.    United's stated reasons for discharge—"inability to perform duties" and "failure to communicate"—are inconsistent with the contemporaneous record and contradicted by United's own representatives.  The true motives were discriminatory and retaliatory:  United perceived Mr. Castillo as an alcoholic based on unfounded stereotypes, treated him less favorably than similarly situated White pilots, and punished him for asserting his rights and engaging counsel.

### E.  United's Admission of Retaliatory Motive and Post-Termination Events

43.    On November 6, 2023—the same day United terminated Mr. Castillo—Chief Pilot Ernie Aller told Mr. Castillo's ALPA representative that the company terminated Mr. Castillo for "lawyering up and not communicating with the company." This admission contradicts United's own records, which show that management had received continuous updates about Mr. Castillo's medical-certificate status through early November.  Aller's statement reveals that United's true grievance was not a

lack of communication but was in part Mr. Castillo's decision to retain counsel to protect his rights, a protected activity under both the ADA and Title VII.

44.     Mr. Castillo did not learn of Chief Pilot Aller's retaliatory statement—that United terminated him for "lawyering up and not communicating with the company"—until after seeing his union representative's notes for the first time and after he had signed and filed his EEOC charge of discrimination.  What is more, Mr. Castillo did not understand, and could not reasonably have understood, the retaliatory significance of Aller's statement.  Its import as evidence of retaliatory motive has only now come to light.  This newly recognized significance indicates, for the first time, that United's decision was influenced by hostility toward Mr. Castillo's protected activity—retaining counsel and opposing perceived discrimination.  That meaning was not previously apparent and could not reasonably have been apparent to Mr. Castillo in time to amend his EEOC charge before the issuance of the right-to-sue notice.

45.     United issued the termination without any further meeting or opportunity for Mr. Castillo to respond.  No written warning, investigatory hearing, or formal review preceded the decision.  The abrupt discharge stood in marked contrast to United's usual practice of maintaining open communication with pilots undergoing FAA review.

46.     Immediately after the termination, United falsely reported to the Federal Aviation Administration that Mr. Castillo was discharged for "pilot-performance" issues.  This false entry damaged his professional reputation and

hindered his ability to seek other flight employment until it was later corrected through legal intervention.

47.     Following his termination, Mr. Castillo sought to challenge United's actions through both his union channels and pro se through the Equal Employment Opportunity Commission ("EEOC").  His internal grievance under the Air Line Pilots Association procedure was denied around February 2024, leaving the EEOC process as his remaining recourse.

### F. FAA Misreporting and Defamation

48.     Following Mr. Castillo's termination on November 6, 2023, United falsely reported to the FAA that his separation was due to "pilot performance" issues.

49.     The report was submitted directly to the FAA's pilot-records systems which is consulted by prospective employers in evaluating pilot applicants.

50.     Mr. Castillo later retained specialized counsel to address the error. United subsequently corrected the entry to reflect "Other – Physical/Medical Disqualification" on or about May 28, 2025.

51.     United knew or should have known that the "pilot-performance" designation was false when it was submitted, and it unreasonably delayed correcting the record for approximately eighteen months, during which Mr. Castillo incurred legal expense to obtain the correction.

52.     As a result of United's false reporting and delayed correction, Mr. Castillo suffered reputational harm, lost or will lose employment opportunities with prospective aviation employers, and emotional distress.

14

53.     On information and belief, United has made similar inaccurate termination reports regarding at least one other pilot, reflecting a pattern of misreporting.

### G. EEOC Process and Agency-Induced Delay

54.     Mr. Castillo initiated contact with the Equal Employment Opportunity Commission ("EEOC") on November 18, 2023, less than two weeks after his termination, by submitting an online inquiry.

55.     The EEOC scheduled an intake interview for February 20, 2024, which was confirmed by email on February 12, 2024.  During that interview, Investigator Rafael Rivera discussed the allegations and advised Mr. Castillo that the EEOC would temporarily close his inquiry rather than draft a formal charge.  Investigator Rivera instructed Mr. Castillo to wait before filing until he obtained additional information—including comparator data on other pilots who retained employment after DUI arrests, a note or diagnosis from his physician, and the FAA's final decision on his deferred medical certificate.  That same day, Investigator Rivera sent a follow-up email confirming his recommendation and designating the file as "declined to file at present."

56.     Acting in good faith and in reliance on the investigator's instructions, Mr. Castillo diligently collected the information requested.  On August 13, 2024, he received the FAA's letter denying his unrestricted First-Class Medical Certificate and requiring him to apply for a special issuance.  He immediately notified Investigator Rivera on August 15, attaching the FAA letter and stating that he remained committed to pursuing his claim.

57.    Investigator Rivera replied on August 16, 2024, asking for further details and indicating the agency "might be able to use" the date the FAA denied his unrestricted First-Class Medical Certificate to calculate timeliness.  He added, "[i]f we are unable to use the date, your charge may be untimely.  If that is the case, you can still file and we can still issue a notice of right to sue, which will give you 90 days to file suit against Respondent."

58.    Mr. Castillo provided the requested materials on August 26, 2024, including Dr. George Glass's evaluation report confirming that Mr. Castillo was not an alcoholic, as well as noting his continued active military flight status.  Investigator Rivera responded on August 29, 2024, stating that he needed to "look at the schedule" to arrange another interview and would "keep you posted."

59.    After receiving no follow-up, Mr. Castillo emailed Investigator Rivera again on September 6, 2024, supplying additional comparator information.  On September 10, 2024, Investigator Rivera scheduled Mr. Castillo's interview for September 12, 2024, which occurred as planned.

60.    Mr. Castillo signed his formal Charge of Discrimination on September 13, 2024—the very next day and the first date on which the EEOC allowed him to do so.  Throughout this process, he acted promptly each time the agency requested information, but relied on Investigator Rivera's guidance regarding timing and procedure.

61.    United submitted its position statement on November 22, 2024, arguing that the charge was untimely.  Mr. Castillo filed his written response on December

17, 2024, explaining that any delay resulted from the EEOC's instructions and scheduling delays rather than from inaction on his part.

62.     Mr. Castillo continued to cooperate fully with the EEOC through mid-2025, providing additional comparator data and notice of his FAA special-issuance medical certificate.  On July 15, 2025, the EEOC closed its investigation and issued a right-to-sue letter.  This suit followed within ninety days.

63.     The sequence of events shows that Mr. Castillo contacted the EEOC well within the statutory filing period, relied on explicit instructions from his assigned investigator to postpone formal filing, and responded promptly to all agency communications.  The timing of the signed charge was the direct result of the EEOC's miscalculated deadline and scheduling delays, not any lack of diligence by Mr. Castillo.

## APPLICABLE LAW

64.     The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability." *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017).

65.     The statute prohibits not only discrimination based on actual disability, but also discrimination against individuals whom the employer merely "regards as" having an impairment.

66.     The ADA's "regarded as" provision protects employees from adverse actions based on unfounded perceptions, myths, or stereotypes about impairment,

regardless of whether the individual is actually disabled or requests an accommodation.

67.    The ADA covers not just someone who is disabled but also those subjected to discrimination because they are "regarded as having . . . an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §§ 12102(1)(C), 3(1)(A).

68.    The amended "regarded as" provision reflects the view that "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities are just as disabling as actual impairments." 29 C.F.R. Pt. 1630, App. § 1630.2(1); *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 591–92 (5th Cir. 2016).

69.    An employer violates the ADA by taking adverse action against a "regarded as" disabled employee, instead of providing him with a routine benefit.  *See Hawkins v. Microfibers*, 78 F.3d 582 (5th Cir. 1996); *Duello v. Buchanan Cnty. Bd. of Sup'rs*, 628 F.3d 968, 974 (8th Cir. 2010).

70.    Disparate treatment of an employee because of a perceived impairment—particularly where similarly situated employees are treated more favorably—constitutes discrimination "on the basis of disability" under 42 U.S.C. § 12112(a).

71.    The ADA further prohibits retaliation against an employee for opposing practices made unlawful by the Act or for participating in any related proceeding. *See* 42 U.S.C. § 12203(a).

72.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., makes it unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1).

73.     Title VII also prohibits employers from retaliating against an employee for engaging in protected activity. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).

74.     Under Texas common law, the elements of defamation are: (1) the publication of a false statement of fact to a third party; (2) that was defamatory concerning the plaintiff; (3) with the requisite degree of fault (negligence for private individuals or actual malice for public figures); and (4) damages, unless the statement constitutes defamation per se. *Ridge Petroleum, Inc. v. Energy Ops, LLC*, 611 S.W.3d 36, 46 n.6 (Tex. App.—El Paso 2020, no pet.)

75.     Statements that adversely reflect on a person's fitness to conduct his or her business or trade are deemed defamatory per se, presuming general damages. *See In re Lipsky*, 460 S.W.3d 579, 596 (Tex. 2015).

## CAUSES OF ACTION

Plaintiff brings the following causes of action arising under federal law and Texas common law.

**COUNT ONE:**
**ADA –Disability Discrimination (Regarded-As Disabled)**
(42 U.S.C. § 12101, *et seq.*)

76.     Plaintiff restates the foregoing paragraphs as if fully set forth herein.

77.     The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating against a qualified individual on the basis of disability, including an individual who is regarded as having an impairment.  42 U.S.C. § 12112(a).

78.     United violated the ADA by terminating Plaintiff because it regarded him as disabled due to a perceived alcohol-use disorder and by treating him less favorably than similarly situated pilots whose FAA medical certificates had lapsed, including pilots actually diagnosed with alcoholism who were allowed to remain employed while completing medical review or treatment.

79.     United regarded Plaintiff as disabled because it perceived him as suffering from alcoholism— an impairment that, in its view, substantially limited his ability to work as a pilot.  That perception was evident in United's repeated insistence that he enroll in the Human Intervention Motivation Study ("HIMS") program, a substance-abuse treatment track, despite medical findings that he had no alcohol-use disorder.  Because Plaintiff had no such disorder and was later cleared by an independent medical evaluation, pressuring him to in HIMS was discriminatory rather than corrective.

80.     Plaintiff was fully qualified for his position as a First Officer, having successfully completed training, flown revenue passengers without incident, and

remained capable of performing the essential functions of his job. His temporary lapse in FAA medical certification did not render him unqualified.

81.    United terminated Plaintiff on November 6, 2023, citing his temporary loss of FAA medical certification. That rationale was pretextual and based on the same mistaken perception of alcoholism. United's decision to discharge Plaintiff, rather than extend the routine treatment afforded to other pilots with temporary medical deferrals, constituted disparate treatment "on the basis of disability" within the meaning of § 12112(a). *See Hawkins v. Microfibers*, 78 F.3d 582 (5th Cir. 1996).

82.    United was on clear notice of Plaintiff's situation through his direct communications with ACPO Bettencourt and through information provided by his ALPA representative. Plaintiff specifically informed ACPO Bettencourt that Plaintiff's FAA medical certificate was pending renewal and requested guidance on leave options. Bettencourt acknowledged that pilots in such situations were routinely placed on unpaid leave until re-certified. United nevertheless departed from that established practice and discharged Plaintiff because it perceived him as an alcoholic.

83.    United's disparate treatment of Plaintiff, as compared with other pilots placed on unpaid leave during FAA medical review, was intentional and without legitimate justification.

84.    As a direct result of United's unlawful conduct, Plaintiff suffered lost wages and benefits, emotional distress, and significant damage to his professional reputation.

85.    United's conduct was intentional, willful, and carried out in reckless disregard of Plaintiff's federally protected rights under the ADA.

86.    Plaintiff seeks reinstatement to his position as a First Officer at United Airlines, or alternatively, front pay in lieu of reinstatement, together with back pay, compensatory and punitive damages, attorneys' fees, and costs.

## COUNT TWO:
### TITLE VII – Disparate Treatment (Race and National Origin)
(42 U.S.C. § 2000e-2(a))

87.    Plaintiff restates the foregoing paragraphs as if fully set forth herein.

88.    Title VII prohibits an employer from discharging or otherwise discriminating against an employee with respect to the terms, conditions, or privileges of employment because of the employee's race or national origin.  42 U.S.C. § 2000e-2(a)(1).

89.    United violated Title VII by terminating Plaintiff's employment because he is Hispanic, by treating him less favorably than similarly situated White pilots, and by acting on racial and ethnic stereotypes associating Hispanic men with alcohol abuse.

90.    Plaintiff is a Hispanic male and a member of a protected class under Title VII.

91.    Plaintiff was qualified for his position as a First Officer, having successfully completed United's training, flown revenue passengers without incident, and maintained all required qualifications until his FAA medical certificate temporarily lapsed pending the FAA investigation and review.

92.     On November 6, 2023, United terminated Plaintiff's employment, citing "inability to perform duties" due to that temporary lapse.

93.     On information and belief, at least one White probationary pilot at the same base who was arrested for driving under the influence shortly after Plaintiff retained his position despite lacking a valid medical certificate because United granted him unpaid leave and permitted him to resolve his FAA medical review without termination.

94.     These pilots were similarly situated to Plaintiff in all material respects—they shared the same base (Houston IAH), supervisor (Chief Pilot Aller), and probationary status—but received more favorable treatment.

95.     United's perception of Plaintiff as an alcoholic was intertwined with racialized stereotypes about Hispanic men and alcohol use. These intertwined biases led United to treat a Hispanic pilot's single arrest as evidence of addiction while viewing comparable conduct by White pilots as remediable and non-disqualifying.

96.     United's stated reason for termination—"inability to perform duties"— was pretextual. In practice, United routinely allowed other pilots, including White pilots and those actually diagnosed with alcoholism, to remain employed or on unpaid leave while their FAA medical certifications were under review, while terminating Plaintiff outright based on its mistaken perception that he suffered from an alcohol-use disorder. At the same time, United's insistence that Plaintiff enroll in HIMS, despite no diagnosis of alcohol dependence, reflected the very stereotype that fueled its discriminatory treatment.

97.     Plaintiff's probationary status does not shield United from liability; Title VII requires equal treatment regardless of tenure or seniority.

98.     The demographics of the airline industry, in which approximately ninety percent of commercial pilots are White males, further support an inference of systemic bias against Hispanic pilots.

99.     Plaintiff's race and national origin were both motivating factors and but-for causes of his termination.

100.    As a direct result of United's discrimination, Plaintiff suffered lost wages, benefits, emotional distress, and damage to his professional reputation.

101.    Plaintiff seeks reinstatement to his position as a First Officer, or alternatively, front pay in lieu of reinstatement, together with back pay, compensatory and punitive damages, attorneys' fees, and costs.

102.    United's actions were intentional, willful, and taken in reckless disregard of Plaintiff's federally protected rights.

## COUNT THREE:
### ADA and TITLE VII – Retaliation
(42 U.S.C. § 12203 and 42 U.S.C. § 2000e-3(a))

103.    Plaintiff restates the foregoing paragraphs as if fully set forth herein.

104.    The Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964 both prohibit an employer from retaliating against an employee who opposes conduct made unlawful by those statutes or who participates in any manner in an investigation, proceeding, or other protected activity. 42 U.S.C. §§ 12203(a), 2000e-3(a).

24

105.    Plaintiff engaged in protected activity by retaining legal counsel to address United's treatment of him following his July 22, 2023 arrest, by opposing United's perception that he suffered from alcoholism, and by asserting his rights under federal anti-discrimination laws. Plaintiff's retention of counsel, provision of attorney correspondence to United, and cooperation with his union representative in challenging the company's actions were all protected activities.

106.    On November 6, 2023, United terminated Plaintiff's employment—the same day Chief Pilot Ernie Aller told Plaintiff's union representative that Plaintiff was fired for "lawyering up and not communicating with the company."  This statement constitutes direct evidence that United terminated Plaintiff in retaliation for his protected activity of retaining counsel and asserting his rights.

107.    At the time Plaintiff filed his EEOC charge, he was unaware of Aller's retaliatory statement and lacked the means to discover it for over a year—that is, until he first received his ALPA representative's notes, which occurred after he had already signed and filed the charge.  Even then, Mr. Castillo, acting in his pro se capacity, could not reasonably have understood the legal significance of Aller's statement.  Its import as evidence of retaliatory motive has only now come to light. Because the retaliation identified in that statement concerns the same adverse employment action—the November 6, 2023 termination—already challenged in Plaintiff's timely EEOC charge, the retaliation claim falls within the scope of the EEOC's investigation and is properly before this Court.

108.    Defendant's proffered reasons for termination—"inability to perform duties" and "failure to communicate"—were pretextual.  United's own records confirm that management had accurate and timely information about Plaintiff's FAA medical status.  A true motive for termination was retaliation for Plaintiff's decision to obtain legal representation and resist being forced into an unnecessary substance-abuse program.

109.    The temporal proximity between Plaintiff's protected activity (retaining counsel and providing attorney correspondence in July and August 2023) and his termination on November 6, 2023, further supports a causal connection.

110.    United's retaliatory conduct was intentional, willful, and carried out in reckless disregard of Plaintiff's federally protected rights under the ADA and Title VII.

111.    As a direct result of United's unlawful retaliation, Plaintiff suffered lost wages and benefits, emotional distress, reputational harm, and other consequential damages, including legal expense required to correct the company's false FAA reporting.

112.    Plaintiff seeks reinstatement to his position as a First Officer at United Airlines or, alternatively, front pay in lieu of reinstatement, together with back pay, compensatory and punitive damages, attorneys' fees, and costs.

<u>**COUNT FOUR:**</u>
**DEFAMATION**
(Texas Common Law)

113.    Plaintiff restates the foregoing paragraphs as if fully set forth herein.

114.    Under Texas law, the elements of defamation are: (1) publication of a false statement of fact to a third party; (2) the statement was defamatory concerning the plaintiff; (3) the defendant acted with negligence (for private plaintiffs) or actual malice (for public figures or matters of public concern); and (4) damages, unless the statement is defamatory *per se*.

115.    Defendant published a false statement by submitting to the Federal Aviation Administration ("FAA") an official report falsely stating that Plaintiff's termination was due to "pilot performance" issues, when the actual reason related to the temporary lapse of his FAA medical certificate.

116.    This false report was published around November 6, 2023, to the FAA and thereafter became accessible to prospective employers through the FAA's pilot records systems.

117.    The statement was defamatory *per se* because it adversely reflected on Plaintiff's competence and fitness to perform his profession as an airline pilot, tending to injure his reputation in the aviation industry.  *See In re Lipsky*, 460 S.W.3d 579, 596 (Tex. 2015).

118.    Defendant acted with at least negligence, and on information and belief with actual malice, knowing or having reason to know that the "pilot performance" designation was false.  Evidence suggests a pattern of similar misreporting by United concerning at least one other pilot.

119.   As a direct and proximate result, Plaintiff suffered reputational harm, loss of employment and advancement opportunities, emotional distress, and the expense of hiring legal counsel to correct the false record.

120.   No federal or state privilege or immunity applies.  The Pilot Records Improvement Act ("PRIA"), 49 U.S.C. § 44703, governs only the furnishing of records between air carriers with a pilot's consent and does not extend to a carrier's direct submissions to the FAA.  Even if PRIA applied, its limited immunity does not cover information "furnished with knowledge that it was false," and Plaintiff alleges such knowing falsity here.

121.   Defendant's knowing or reckless misrepresentation supports an award of exemplary (punitive) damages for malice.

122.   As a proximate result of Defendant's conduct, Plaintiff seeks actual damages for lost earnings and reputational harm, as well as exemplary damages.

123.   This claim arises from the same nucleus of operative facts as Plaintiff's federal claims, and supplemental jurisdiction is proper under 28 U.S.C. § 1367.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, awarding relief as follows:

(i)   Declare that Defendant United Airlines, Inc. violated the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) by regarding Plaintiff as disabled and by terminating his employment and otherwise treating him less favorably than similarly situated pilots on that basis;

(ii)    Declare that Defendant violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) by discriminating against Plaintiff on the basis of his race and national origin;

(iii)    Declare that Defendant violated the ADA and Title VII by retaliating against Plaintiff for opposing discrimination and for engaging in protected activity under those statutes;

(iv)    Declare that Defendant defamed Plaintiff under Texas common law by falsely reporting his termination to the Federal Aviation Administration as due to "pilot performance" issues;

(v)    Order Defendant to reinstate Plaintiff to his position as a First Officer, with full seniority, benefits, and pay as if his employment had not been terminated, or alternatively, award front pay in lieu of reinstatement;

(vi)    Award Plaintiff back pay, including lost wages, benefits, and interest, in an amount to be proven at trial;

(vii)    Award Plaintiff compensatory damages for emotional distress, pain and suffering, humiliation, and reputational harm, in an amount to be proven at trial;

(viii)    Award Plaintiff punitive damages for Defendant's malicious, reckless, or intentionally discriminatory conduct, in an amount to be proven at trial;

(ix)    Award Plaintiff his reasonable attorneys' fees, expenses, and costs; and

(x)    Grant such other and further relief as the Court deems just and proper.

29

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all counts so triable.

October 13, 2024

Respectfully submitted.

/s/ *Jace R. Yarbrough*
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
Jace R. Yarbrough
Texas Bar No. 24110560
**S | L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX  75104
Phone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@slfirm.com
jace.yarbrough@ slfirm.com

*Attorneys for Plaintiff*

31